**Keith E. MULLER, Plaintiff–Appellee,**

**v.**

**Joseph J. COSTELLO, Individually and as Superintendent of Midstate Correctional Facility; Susan A. Connell, Individually and as Deputy Superintendent of Administration at Midstate Correctional Facility; John Doe, Individually and as employee of the Midstate Correctional Facility; Joseph Sgt. Ward, Sergeant, Individually and as an agent of the Midstate Correctional Facility and Thomas Krasko, Individually and as an employee of Midstate Correctional Facility, Defendants,**

**The State of New York; New York State Department of Correctional Service, Defendants–Appellants,**

**United States of America, Intervenor.**

Docket Nos. 98–7491, 98–7729

United States Court of Appeals,
Second Circuit.

Argued April 27, 1999.

Decided Aug. 11, 1999.

Norman P. Deep, Clinton, NY, for Plaintiff–Appellee.

Andrea Oser, Assistant Attorney General, Albany, N.Y. (Dennis C. Vacco, Attorney General of the State of New York, Albany, NY, Peter H. Schiff, John McConnell, Deputy Solicitor Generals, Nancy A. Spiegel, Assistant Attorney General, Albany, NY, of counsel) for Defendants–Appellants.

Seth M. Galanter, Attorney, Department of Justice, Washington, DC (Bill Lann Lee, Acting Assistant Attorney General, Washington, DC, Jessica Dunsay Silver, Attorney, Washington, DC, of counsel) for Intervenor.

Before: WINTER, Chief Judge, and MINER and POOLER, Circuit Judges.

MINER, Circuit Judge:

Defendants-appellants New York State and the New York State Department of Correctional Service (collectively, "DOCS") appeal from a judgment granting damages and other relief to plaintiff-appellee Keith E. Muller by the United States District Court for the Northern District of New York (Scullin, J.), following a jury trial. Muller, a correctional officer formerly employed by DOCS, brought suit alleging that DOCS discriminated against him because of his disability of reactive airway disease, which substantially impaired his major life activities of working and breathing, and that DOCS had retaliated against him for seeking to enforce his rights under state and federal law, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. At trial, DOCS moved for judgment as a matter of law on the disability claim at the end of Muller's case, arguing that Muller had failed to present sufficient evidence from which a jury could conclude that Muller suffered from a disability within the meaning of the ADA. The court denied this motion. After DOCS presented its defense, the case was submitted to the jury, and the jury returned a verdict in favor of Muller on both the discrimination and retaliation claims. DOCS then renewed its motion for judgment as a matter of law. In this motion, DOCS argued, inter alia, that Muller had presented legally insufficient evidence to support a finding of disability and that the district court was without jurisdiction to consider Muller's claims because the Eleventh Amendment rendered the state defendants immune from suit under the ADA. The court denied the motions for judgment as a matter of law, finding that Muller had presented ample evidence that his ability to work was substantially limited and thus not addressing whether Muller's ability to breathe was similarly impaired. As to the Eleventh Amendment argument, the court concluded that the ADA represented a valid exercise of Congress's authority under § 5 of the Fourteenth Amendment and was consequently an effective abrogation of states' Eleventh Amendment immunity.

We affirm the judgment to the extent that it is supported by the retaliation claim, for the reasons that follow.

## BACKGROUND

DOCS hired Muller in June of 1988 to serve as a correctional officer. After training and a probationary period, Muller received permanent assignment to Midstate Correctional Facility ("Midstate"), which is located in Marcy, New York, approximately one hour east of Syracuse.

In February of 1989, Muller fell ill with pneumonia. He continued to work for DOCS for the next two years, although his respiratory problems did not cease. As a result of these problems, he took a number of sick days. In November of 1991, Muller visited a doctor to assess his continuing respiratory ailment. The doctor diagnosed Muller with "severe bronchitis with a

strong asthmatic component" and recommended that he have "no exposure to tobacco smoke while at work." Muller presented a note to this effect from his doctor to the personnel section at Midstate.

Since 1990, Midstate has had a written policy regarding smoking in the workplace. Under the policy, smoking is permitted in the housing units but generally prohibited in other areas of the facility. Under a "one-person-office" exception, a DOCS employee assigned to a one-person office may smoke in that office.

Upon his return to work on November 22, 1991, Muller was assigned to a housing unit. He became sick and went home. Muller returned to work the following day and was again assigned to a housing unit. Soon thereafter, he submitted a memorandum to his superior requesting a smoke-free environment and filed a formal complaint with the county health department.

During this period of time, Muller attempted a number of measures to limit his exposure to cigarette smoke. Through a seniority-based bidding system, he bid on and received assignments to the midnight shift to limit his exposure to cigarette smoke. At one point, Muller received permission to open windows in a housing unit but was later ordered to keep the windows closed after inmates complained about the cold air. During 1992, though Muller continued to work in the housing units, he was sick and absent from work only occasionally. Nonetheless, he filed numerous grievances with DOCS regarding the lack of healthy and safe working conditions at the facility. There is evidence that DOCS was responsive to some of these grievances; for example, the designation of the "chart office," which many officers were required to pass through, was changed from smoking to non-smoking. Although the smoking policy gradually grew more restrictive from its inception in 1990, Muller observed a number of incidents throughout his employment where inmates and employees violated the policy without repercussion.

In August of 1993, Muller received a list of smoke-free positions within Midstate. Despite his awareness of available smoke-free posts, Muller bid for and received a "vacation post," which entailed substituting for officers on vacation. Muller bid for this position although he knew that there was a likelihood that he would be stationed in an environment in which smoke was present. Over this period of time, however, Muller made others aware of his condition and requested that the administration place "No Smoking" signs in designated non-smoking areas.

In December of 1993, while working in one of the housing units, Muller reacted to secondhand smoke and went to the emergency room at a local hospital after being advised to do so by a Midstate nurse. Muller returned to work approximately one week later with another note from a doctor stating that he could not work in an environment where smoke was present. At this time, Muller's doctor filed a report with the New York State Education Department, Office of Vocational Educational Services for Individuals with Disabilities ("VESID"). On January 11, 1994, a VESID official wrote to the Superintendent of the prison stating that Muller was disabled and requesting that DOCS assign Muller to a smoke-free environment. Two weeks later, having received no response, the same official again wrote to the Superintendent, explaining that the Superintendent's failure to respond would be understood as a refusal to offer an accommodation, and VESID would be forced to continue with administrative procedures.

In February of 1994, DOCS responded by sending Muller an "application request for reasonable accommodations." After Muller submitted this application to DOCS, requesting a "smoke-free environment," DOCS sent him for an employee health physical in Albany, New York. The examining doctor stated that Muller could perform the essential functions of a correctional officer and recommended that Mul-

ler be provided with proper respiratory precautions from environmental irritants such as tobacco smoke.

Several days later, Muller received a telephone call from a DOCS official stating that he could return to work and that he would be provided a mask to wear. Muller was given a box of white paper masks to wear; these masks covered his mouth and nose and were held in place by a flexible metal nose piece and a rubber band that went around his neck. A statement on the box containing the masks warned that the masks did not "protect against fumes, gas or vapors." Consistent with its warning, the mask did not protect Muller from secondhand smoke in the facility. He continued to get sick while at work. Additionally, Muller felt humiliated by being forced to wear the mask and observed a loss of "credibility" in front of the inmates. Muller later forwarded a doctor's note to DOCS stating that the paper mask was inappropriate for Muller's medical condition.

In March of 1994, DOCS provided a different type of mask. The second mask was a rubber mask with detachment filters. After being fitted with the mask, a DOCS employee administered a "fit test" in which Muller was enclosed in a tent and a smoke irritant was introduced to the tent. After the irritant was introduced, Muller began to cough, felt dizzy and nauseous, and was taken to the emergency room. When Muller returned to work five days later, he was fitted with a larger mask of the same type. Though he was apprehensive about participating in another "fit test," Muller once again entered the tent and breathed the irritant through the mask. Again he got sick, felt dizzy and nauseous, and was taken to the emergency room. After the second "fit test," efforts to provide Muller with a respirator temporarily ceased.

From January of 1993 onward, if Muller was assigned to a smoking post, he would report to the post and "last as long as [he] could" before going to the nurse and seek-ing medical help. There were a number of occasions when Muller would not accept assignment to a post that was not smoke-free, at which point he would be sent to the nurse and excused from work for the day. Throughout the spring and summer of 1994, there were a number of occasions on which Muller became ill and sought treatment at a hospital emergency room. Muller was never formally disciplined for refusing to accept a post during this time, and he was allowed to return to work if he provided a note from his doctor stating that he needed to work in a smoke-free environment.

In August of 1994, after two successful "fit tests," Muller was issued two different masks. Neither of the two masks fully met Muller's needs, however: one of the masks restricted his breathing, rendered him unable to eat or drink while wearing it, created difficulty communicating with inmates and co-workers, and was described as "ridiculous" by other officers. The other mask did nothing to shield Muller's eyes from irritation and made it difficult for him to breathe. Moreover, the masks posed a safety risk because the straps could have been used by inmates to choke Muller and made emergency communication difficult.

From June of 1994 to February of 1995, Muller was assigned to a non-smoking post outside of Midstate. During this period, Muller was fully able to perform his duties and filed no grievances. On July 6, 1994, Muller filed a complaint in the United States District Court for the Northern District of New York. Muller alleged discrimination and retaliation under the ADA, violations of his civil rights under 42 U.S.C. § 1983, and pendent state law claims for negligence and intentional infliction of emotional distress. DOCS filed a motion to dismiss the complaint for failure to state a claim in August of 1994.

In February of 1995, Muller was reassigned to a post within Midstate and again experienced trouble breathing and head-

aches while wearing the masks. In March of 1995 Muller visited a doctor, who ordered that Muller could only wear a mask for four hours per day, in two hour increments, with at least one hour between the increments. On his doctor's orders, Muller did not return to work from March of 1995 to May of 1995.

Although the facility's doctor, having evaluated Muller in March of 1995, also concluded that Muller was fully able to perform the duties of a correctional officer, Muller was told by his supervisor that he could not return to work in May of 1995. Muller did not return to work until November of 1995, at which point he was assigned to a housing unit. Muller filed a grievance concerning this assignment. From November of 1995 through April of 1996, although eventually assigned to posts ostensibly in non-smoking areas, Muller frequently experienced respiratory problems due to disregard of the smoking policy, the one-man office rule and recirculated air within the facility. During this period, when Muller felt ill enough to require leaving work, he would report to the nurse, go home, and visit his doctor. He would return between one and ten days later with a doctor's note stating that he could return to work only if stationed in a smoke free environment.

In mid-March, 1996, Muller again had to leave work because of difficulty breathing. His doctor kept him out of work until April 1, 1996. On April 1, Muller bid for a "miscellaneous post," which entailed duties that might be in smoking or non-smoking areas. On April 3, Muller returned to work with a doctor's note explaining his need to work in a smoke-free environment without a respirator. At that time, Muller was told by a supervisor that he could not return to work because the facility could not meet his conditions.

On April 16, 1996, Judge Scullin issued a Decision and Order addressing DOCS' motion to dismiss Muller's complaint. *See Muller v. Costello*, No. 94–CV–842, 1996 WL 191977 (N.D.N.Y. May 20, 1996).

Finding DOCS amenable to suit under the ADA and its explicit waiver of states' Eleventh Amendment immunity, and finding Muller's allegations of disability and lack of reasonable accommodations sufficient to survive a motion to dismiss, the court denied the motion to dismiss Muller's ADA claims. It dismissed Muller's claims against DOCS and the individual defendants under § 1983, and dismissed Muller's negligence claim against the individual defendants.

For several months beginning in April of 1996, DOCS prohibited Muller from reporting to work at Midstate, though he was technically still employed. He did not receive workers' compensation or unemployment compensation, and he had exhausted his sick and vacation leave. During this time, Muller requested permission to seek 30 hours of outside employment per week, which was granted to the extent of 20 hours per week. In November of 1996, Muller once again presented a note from his doctor to his supervisor at Midstate. The note stated that Muller could return to work if he worked in a smoke-free environment and was not required to wear a respirator. DOCS denied his request to return at that time.

In February of 1997, Muller presented another doctor's note to DOCS. This note was written in an attempt by Muller and his counsel to obtain a note that would satisfy DOCS' concerns and allow Muller to return to work. As distinguished from previous notes, the February doctor's note defined a "smoke-free work environment" as a non-smoking area and did not mention Muller's use of a respirator. Shortly thereafter, Muller received a telephone call from the Deputy Superintendent for Administration telling him that he could return to work immediately and that he should make arrangements to be put on the schedule.

After February 21, 1997, when Muller returned to work, he was assigned to various posts within Midstate, some of which

were in non-smoking areas and some of which were in smoking areas. Muller was occasionally troubled by having to work in smoking areas or by inmates or employees smoking in designated non-smoking areas but did not need to leave work or miss any days until March 31. On March 31, Muller called in sick due to smoke exposure the day before while stationed in the infirmary, a non-smoking area. He was absent from work until April 8. Muller returned to work on April 8 to present a doctor's note and reported for duty on April 9. On April 9, a few minutes after reporting to duty at a housing unit, Muller was confronted by a supervisor, who told him that his doctor's note was "too vague" and sent him home. After leaving work, Muller presented another note on April 9 and returned to work the following day. For the next several days, Muller was assigned to non-smoking areas or traded shifts with other officers and completed his workdays without incident.

On April 15, 1997, Muller was ordered to report to a housing unit. As he had done before, Muller refused to report, stating that working in a smoke-filled environment was against medical orders. This time, however, rather than being ordered to report to the nurse's office, he was suspended from service at Midstate without pay. These events occurred after the resolution of pre-trial motions but before trial; the district court allowed Muller to include his suspension as part of his retaliation claim without expressly amending his complaint.

Trial on Muller's claims began in September of 1997. At trial, Muller presented his own testimony and the testimony of seventeen witnesses, including seven Midstate employees, four doctors, an expert in industrial hygiene, an employee of VESID, an employee of the Oneida County Department of Health, a union representative, and his wife. At the end of Muller's case, DOCS moved for judgment as a matter of law, arguing that Muller had failed to prove that he suffered from a "disability" within the meaning of the ADA. The indi-

vidual defendants also moved to dismiss Muller's ADA claims against them. The court dismissed the claims against the individual defendants but denied the motion for judgment as a matter of law against DOCS.

After DOCS' presentation, during which it presented six witnesses, Judge Scullin charged the jury without objection on discrimination and retaliation under the ADA, and they retired to deliberate. After about five hours of deliberations, the jury returned a verdict in favor of Muller on both counts. On the discrimination claim, the jury specifically found that Muller suffered from a "disability" under the ADA, that he was otherwise qualified, that DOCS had not reasonably accommodated him, that such accommodation would not have constituted an undue hardship, and that DOCS had intentionally discriminated against him. As to the retaliation claim, the jury found that Muller was engaged in a protected activity, that he was subjected to an adverse employment action, and that there was a causal relationship between the protected activity and the adverse employment action. The jury awarded a total of $420,300, which it subdivided into $135,000 for Muller to receive additional education to find "different employment" and $285,000 for "pain and suffering and mental anguish." Judge Scullin polled the jury and ascertained that it intended the entire amount to be a compensatory award.

Following the verdict, DOCS renewed its motion for judgment as a matter of law, or, in the alternative, for a new trial. DOCS also moved to cap the jury's verdict at $300,000 and to vacate or reduce the verdict as excessive. Muller cross-moved for reinstatement to his position at Midstate, an injunction to allow him a special opportunity to take the New York State correctional officer sergeant's examination, and for back pay and lost benefits.

As it had in previous oral motions, in its motion for judgment as a matter of law or a new trial, DOCS argued that the record did not contain sufficient evidence for a

jury reasonably to find that Muller's asthma limited his major life activities of breathing or working, and thus Muller was not "disabled" within the meaning of the ADA. DOCS also argued that the court lacked jurisdiction over the suit because the ADA did not apply to prisons and the state was immune from Muller's suit under the Eleventh Amendment.

The court denied DOCS' motions for judgment as a matter of law or a new trial. *See Muller v. Costello,* 997 F.Supp. 299 (N.D.N.Y.1998). In its view, the evidence supported a finding that Muller's asthma affected his ability to perform any job in which he might come into contact with smoke or other asthma-inducing chemicals. Because he found ample evidence that Muller's ability to work was impaired, Judge Scullin did not address the evidence regarding Muller's breathing impairment. The court then capped the damages award at $300,000 in accordance with 42 U.S.C. § 1981a(b)(3)(D) but otherwise declined to find the award excessive in light of the evidence presented at trial.

The court found that DOCS was not immune under the ADA and that it thus had subject matter jurisdiction over the claims. Judge Scullin found that it was clear that Congress intended to include state prison employees within the scope of the ADA. As to the Eleventh Amendment issue, Judge Scullin determined that the ADA was intended to abrogate states' immunity and was validly enacted pursuant to section 5 of the Fourteenth Amendment. Addressing Muller's motions, the court ordered Muller's reinstatement at Midstate "in such position and to such duties that are . . . . in compliance with the New York State Clean Indoor Air Act." The court also ordered back pay but declined to mandate that Muller be provided a special opportunity to take the sergeant's examination.

On April 7, 1998, the court entered judgment in accordance with the jury's verdict and the post-trial disposition of motions. This appeal followed.

**DISCUSSION**

On appeal, DOCS raises two contentions. First, it argues that the district court did not have jurisdiction to adjudicate the ADA claims because New York State, and DOCS as its agency, were immune under the Eleventh Amendment. Second, it raises a challenge to the sufficiency of Muller's proof that his major life activities of "breathing" and "working" were impaired.

*I. The ADA and the Eleventh Amendment*

DOCS contends that, as a state agency, it is immune from claims under the ADA because the ADA does not validly abrogate states' immunity to suit in federal court under the Eleventh Amendment. We review this issue *de novo* because it involves the interpretation and constitutionality of a federal statute. *See United States v. Bianco,* 998 F.2d 1112, 1120 (2d Cir.1993).

In *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 55–58, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court set forth a two-part test for determining whether an act of Congress abrogates states' Eleventh Amendment immunity: (i) Congress must unequivocally express its intent to abrogate the immunity; and (ii) Congress must act pursuant to a valid exercise of power. *Accord Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank,* —— U.S. ——, 119 S.Ct. 2199, 2205, —— L.Ed.2d —— (1999). DOCS does not dispute that the ADA satisfies the first element under *Seminole Tribe.* Indeed, in light of 42 U.S.C. § 12202, which provides that a "State shall not be immune under the [E]leventh [A]mendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of [the ADA]," any such contention would be difficult to maintain. Rather, DOCS focuses on the

second *Seminole Tribe* element, arguing that Congress exceeded its powers under § 5 of the Fourteenth Amendment in enacting the ADA.

■ Recent Supreme Court precedent has clarified that Congress may abrogate states' Eleventh Amendment immunity pursuant to § 5 of the Fourteenth Amendment but not pursuant to any Article I power such as the Commerce Clause. *See Florida Prepaid Postsecondary Educ. Expense Bd.*, 119 S.Ct. at 2205; *Close v. State of New York*, 125 F.3d 31, 38 (2d Cir.1997) ("After *Seminole*, the only source of congressional abrogation stems from the Fourteenth Amendment.").

■ Section 5 of the Fourteenth Amendment empowers Congress to enact "appropriate legislation" to "enforce" its substantive provisions, including the Equal Protection Clause. A statute is "appropriate legislation" to enforce the Equal Protection clause [1] if "it is plainly adapted to that end and [if] it is not prohibited by but is consistent with the letter and spirit of the [C]onstitution." *Katzenbach v. Morgan*, 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (quotation omitted). In *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Court explained that the authority to enforce the Fourteenth Amendment is a broad power to remedy discrimination and prevent future discrimination, *see id.* at 517–18, 536, 117 S.Ct. 2157, and that Congress can prohibit activities that are not themselves unconstitutional in furtherance of its remedial scheme. *See id.* at 518, 529–30, 117 S.Ct. 2157. It stressed, however, that Congress's power under § 5 must be linked to constitutional injuries and there must be a "congruence and proportionality" between the harms to be prevented and the statutory remedy. *Id.* at 520, 117 S.Ct. 2157. This "proportionality" analysis has been further refined by *Florida Prepaid Postsecondary Education Expense Board*: "for Congress to invoke § 5, it must identify conduct transgressing the Fourteenth Amendment's substantive provisions, and must tailor its legislative scheme to remedying or preventing such conduct." 119 S.Ct. at 2207.

The evil that Congress sought to combat by passing the ADA was irrational discrimination against persons with disabilities.[2] *See generally* 42 U.S.C. § 12101 (1994) (stating, *inter alia*, "some 43,000,000 Americans have one or more physical or mental disabilities[;] . . . historically, society has tended to isolate and segregate individuals with disabilities, and . . . discrimination against individuals with disabilities continue[s] to be a serious and pervasive social problem; . . . discrimination . . . persists in . . . employment"). Congress's finding in paragraph (a)(7) of § 12101 warrants particular emphasis: "individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society . . . ."

Congress spent hundreds of hours in hearings determining the scope of the problem and the best manner to address it. *See* Timothy M. Cook, *The Americans with Disabilities Act: The Move to Integration*, 64 Temp. L.Rev. 393, 393–94 & nn. 1–4 (1991) (reciting deliberative process as including "eleven public hearings

---

**1.** DOCS does not dispute that Congress intended to enact the ADA in furtherance of the Equal Protection Clause.

**2.** Because the issues raised in this case implicate only the employment discrimination provisions of the ADA, we have no occasion to consider the constitutionality of its public services or public accommodations provisions. *See generally* 42 U.S.C. §§ 12131–12165 (public services), 12181–12189 (public accommodations).

[in] the House of Representatives ... and three by the Senate ... [and] lengthy floor debates in the Senate and in the House of Representatives" and collecting citations thereto); *see also Coolbaugh v. Louisiana,* 136 F.3d 430, 436–37 & n. 4 (5th Cir.) (recounting extensive deliberative and fact gathering process), *cert. denied,* — U.S. ——, 119 S.Ct. 58, 142 L.Ed.2d 45 (1998). Congress considered and rejected the assumption that the "inferior economic and social status of disabled people ... [was] an inevitable consequence of the physical and mental limitations imposed by disability," instead attributing the inferior status to "discriminatory policies based on unfounded, outmoded stereotypes and perceptions, and deeply imbedded prejudices toward people with disabilities." H.R.Rep. No. 101–485(III), at 25 (1990), *reprinted in* 1990 U.S.C.C.A.N. 447–48 (House Judiciary Committee Report). Congress intended that the ADA "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," to provide "clear, strong, consistent, enforceable standards" to combat such discrimination, and "to ensure that the Federal Government plays a central role in" the enforcement of these standards through the full use of its legislative powers under § 5 of the Fourteenth Amendment and the Commerce Clause. 42 U.S.C. § 12101(b).

■ It is an established principle of constitutional law that the Equal Protection Clause protects against class or group-based invidious discrimination. The Equal Protection Clause prohibits "arbitrary and irrational discrimination" even if no suspect class or fundamental right is implicated. *Bankers Life & Cas. Co. v. Crenshaw,* 486 U.S. 71, 83, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988); *see Romer v. Evans,* 517 U.S. 620, 631–34, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 450, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (invalidating special use permit requirement for placement of home for mentally disabled where apparent rationale was "irrational prejudice"). Moreover, Congress may prohibit conduct that is not itself unconstitutional as prophylaxis against discrimination that may be subtle or difficult to detect. *See City of Boerne,* 521 U.S. at 529–30, 117 S.Ct. 2157. In light of Congress's findings of the extent of discrimination against people with disabilities, and with due regard to the deference owed to Congress in making such judgments, we will not second-guess Congress's judgment that the ADA was targeted to remedy and prevent irrational discrimination against people with disabilities. *See id.* at 519–20, 117 S.Ct. 2157 ("Congress must have wide latitude in determining where [the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law] lies").

Moreover, we hold, in agreement with four of our sister circuits to have considered the issue,[3] that the ADA is a pro-

---

**3.** The four circuits that have unequivocally found various provisions of the ADA, or the ADA in its entirety, to be constitutional are the Eleventh, the Fifth, the Ninth, and the Seventh. *See Kimel v. Florida Bd. of Regents,* 139 F.3d 1426, 1433, 1442 (11th Cir.1998), *cert. granted,* — U.S. ——, 119 S.Ct. 901, 142 L.Ed.2d 901 *and cert. granted sub nom United States v. Florida Bd. of Regents,* — U.S. ——, 119 S.Ct. 902, 142 L.Ed.2d 901 (1999); *Coolbaugh,* 136 F.3d at 437 (5th Cir.1998); *Clark v. California,* 123 F.3d 1267, 1270–71 (9th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998); *Crawford v. Indiana Dep't of Corrections,* 115 F.3d 481, 487 (7th Cir.1997). In *Alsbrook v. City of*

*Maumelle,* 184 F.3d 999 (8th Cir.1999) (*en banc*), the Eight Circuit, sitting *en banc,* found the enactment of Title II of the ADA, 42 U.S.C. §§ 12131–12165, which prohibits discrimination in public services, outside of Congress's power under § 5 of the Fourteenth Amendment. *See id.* at 1009–10. The *en banc* Eighth Circuit had previously affirmed by an evenly divided vote a district court's finding that the employment discrimination provisions contained in Title I of the ADA were a constitutional exercise of Congress's § 5 power. *See Autio v. AFSCME,* 157 F.3d 1141 (8th Cir.1998) (*en banc*) (*affirming Autio v. Minnesota,* 968 F.Supp. 1366, 1371–72 (D.Minn. 1997)). The Fourth Circuit, in *Brown v.*

portionate and congruent response to the discrimination that Congress sought to prohibit. *See City of Boerne*, 521 U.S. at 520, 117 S.Ct. 2157 ("There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."). The ADA targets particular practices—in this case, discrimination in employment— and provides a remedy following the time-tested model provided by the anti-employment discrimination provisions of Title VII of the Civil Rights Act of 1964. *See* H.R.Rep. No. 101–485(III), at 26 (1990), *reprinted in* 1990 U.S.C.C.A.N. 449 ("The [ADA] completes the circle begun [by the Rehabilitation Act] with respect to persons with disabilities by extending to them the same civil rights protections provided to women and minorities beginning in 1964.") (House Judiciary Committee Report); *see also Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51–52 (2d Cir.1998) (applying *McDonnell Douglas* burden shifting analysis to ADA claim).

Despite the extensive hearings and findings that support the ADA, defendants argue that its reasonable accommodation provisions, *see* 42 U.S.C. § 12112(b)(5)(A), (B), are not proportional or congruent to the discrimination that Congress identified. We disagree. The ADA employment provisions define discrimination as, among other things, "not making reasonable accommodations" for a disabled applicant or employee if those accommodations would not "impose an undue hardship on the operation of the business" of the employer. 42 U.S.C. § 12112(b)(5)(A); *see also* 42 U.S.C. § 12112(b)(5)(B) (addressing the denial of employment opportunities to a qualified disabled individual based on the necessity for making a reasonable accommodation). The employer need not make an accommodation if the steps to be taken would "requir[e] significant difficulty or expense," considered in the light of several factors, including the cost of the accommodation and the size and resources of the employer. 42 U.S.C. § 12111(10). As the Fourth Circuit explained in *Coolbaugh*, Congress heard testimony that businesses would benefit from the improved labor pool that would result from making accommodations to the disabilities of potential employees. *See* 136 F.3d at 437–38 (citing testimony). Therefore, Congress enacted a proportional and congruent remedy in requiring employers to make those accommodations that did not impose significant difficulty or expense.

It is this proportionality and congruence that distinguishes the ADA from the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, which the Supreme Court held to be unconstitutional in *City of Boerne*.[4] *See* 521 U.S. at 511, 117 S.Ct. 2157. Congress enacted RFRA in response to *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), in which the Supreme

---

*North Carolina Div. of Motor Vehicles*, 166 F.3d 698, 708 (4th Cir.1999), found the state immune from a regulation promulgated by the Department of Justice pursuant to the ADA prohibiting public entities from charging a fee to cover costs of accessibility programs. Though *Brown*'s holding is relatively narrow, its reasoning seemingly would have invalidated any of the ADA's substantive provisions. Subsequently, in *Amos v. Maryland Dep't of Pub. Safety & Correctional Servs.*, 178 F.3d 212, 222–23 (4th Cir.1999), a different panel of the Fourth Circuit found the enactment of the ADA within the § 5 power of Congress. The majority found that *Brown* did not control because it addressed only the constitutional authority of a regulation promulgated

under the ADA and not the ADA itself. *See id.* at 221 n. 8. In dissent, Judge Williams expressed his belief that *Brown* compelled a result opposite to that reached by the majority and endorsed the reasoning of the *Brown* panel. *See id.* at 228–30 (Williams, J., dissenting).

4. Congress's findings in the ADA are also far more extensive than those made in support of RFRA. *See City of Boerne*, 521 U.S. at 530, 117 S.Ct. 2157 (finding that the legislative record that Congress had compiled in support of RFRA was bereft of any evidence of "modern instances of generally applicable laws passed because of religious bigotry").

Court held that the Free Exercise clause provided no exemption from neutral laws of general applicability. Congress purportedly sought to restore the test used by courts to adjudicate Free Exercise Clause cases prior to *Smith* by prohibiting any state or federal action that "substantially burdened" a person's exercise of religion unless the state action "(1) [wa]s in furtherance of a compelling governmental interest; and (2) [wa]s the least restrictive means of furthering that compelling governmental interest." *City of Boerne*, 521 U.S. at 515–16, 117 S.Ct. 2157 (quoting and discussing 42 U.S.C. § 2000bb–1). The Supreme Court found that RFRA was "so out of proportion" to the problems identified that it could not be viewed as preventative or remedial legislation under § 5 of the Fourteenth Amendment. *Id.* at 532, 117 S.Ct. 2157. Noting the rigor of the test that Congress had prescribed, and more particularly, the applicability of RFRA to all government action in every conceivable field, the Court found that RFRA lacked "congruence" between the "means used" and the "ends to be achieved." *See id.* at 530–32, 117 S.Ct. 2157.

In contrast to RFRA's "[s]weeping coverage" and "intrusion at every level of government," *see City of Boerne*, 521 U.S. at 532, 117 S.Ct. 2157, the anti-discrimination provisions of the ADA provide a narrowly tailored and reasonable response to the problem of discrimination against people with disabilities. Accordingly, Congress's enactment of the ADA was within its authority under § 5 of the Fourteenth Amendment and its abrogation of states' Eleventh Amendment immunity is effective.

## II. Sufficiency of Evidence

In the district court, Muller presented theories that DOCS had discriminated against him based on his disability and that it had retaliated against him for exercising his legal rights. The jury's verdict, upon which Judge Scullin entered judg-

ment, expressly found that Muller was engaged in a protected activity, that he was subjected to an adverse employment action, and that there was causation between the protected activity and the adverse employment action.

■ Although DOCS challenges the sufficiency of Muller's evidence to justify the jury's finding that he was disabled in his major life activities of breathing and working, it does not directly address Muller's retaliation claim. Rather, DOCS apparently presumes that the retaliation finding cannot stand in the absence of a finding that Muller was actually disabled within the meaning of the ADA.

■ Our recent decision in *Sarno v. Douglas–Elliman Gibbons & Ives, Inc.*, 183 F.3d 155 (2d Cir.1999), precludes this argument. In *Sarno*, we ruled that it is "appropriate to apply the framework used in analyzing retaliation claims under Title VII in analyzing a claim of retaliation under the ADA." *Id.* at 159. A prima facie case of retaliation under the ADA is made up of the following elements: "(1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Sarno*, 183 F.3d at 159. With respect to the first element of a retaliation claim, participation in a protected activity, we held that a "plaintiff need not establish that the conduct he opposed was actually a violation of the statute so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated that law." *Id.* (quotations and alteration omitted)

DOCS does not contest the good faith or reasonableness of Muller's belief that he was disabled, nor does it dispute the reasonableness of Muller's belief he was exercising his legal rights against what he perceived to be unlawful discrimination.

Indeed, at oral argument and in post-trial submissions to this Court, DOCS conceded that the jury's retaliation finding should be affirmed on appeal. We therefore affirm the judgment insofar as it is based on the jury's finding of retaliation against Muller.

 As to the discrimination theories, we review the denial of a motion for judgment as a matter of law de novo. *See Valley Juice Ltd. v. Evian Waters of France, Inc.*, 87 F.3d 604, 613 (2d Cir. 1996). Judgment as a matter of law is proper

> when there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [where there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the movant]. We must view "the evidence in the light most favorable to [the non-movant], and [give him] the benefit of all reasonable inferences from the evidence that the jury might have drawn in his favor."

*Padilla v. Metro–North Commuter R.R.*, 92 F.3d 117, 122 (2d Cir.1996) (quoting *Logan v. Bennington College Corp.*, 72 F.3d 1017, 1022 (2d Cir.1995)) (citations omitted and alterations in original).

 The ADA defines a "disability" as (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment;

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The determination of whether an individual is disabled—that is, whether his impairment substantially limits a major life activity—is "made with reference to measures that mitigate the individual's impairment." *Sutton v. United Air Lines, Inc.*, —— U.S. ——, 119 S.Ct. 2139, 2143, —— L.Ed.2d —— (1999). Major life activities include, for purposes relevant to this appeal, "breathing [and] working." 29 C.F.R. § 1630.2(i); *see Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 642 (2d Cir.1998) (listing, under Rehabilitation Act, major life activities including breathing and working). As noted above, in addressing DOCS' post-trial motions, the district court found that there was sufficient evidence to support a jury finding that Muller was impaired in his major life activity of working. The court did not evaluate the evidence presented in connection with the claim of breathing impairment.

*A. Sufficiency of evidence of working impairment*

 Under the law of this Circuit, the EEOC's regulations are entitled to "great deference" in interpreting the ADA.[5] *Reeves v. Johnson Controls World Servs.*, 140 F.3d 144, 150 n. 3 (2d Cir.1998). The EEOC's regulations explain that, in evaluating a claimed impairment to the major life activity of working, "[t]he term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i) (1997). If the plaintiff establishes only "the inability to perform a single, particular job," he has failed to establish a substantial impairment to his major life activity of working. *Id.* In evaluating whether an individual's major life activity of work-

---

5. The Supreme Court has recently drawn into question the degree of deference due to the EEOC's interpretations of the term "disability," noting that Congress did not delegate to it the authority to interpret this term. *See Sutton*, 119 S.Ct. at 2145 ("no agency has been delegated authority to interpret the term 'disability'"). Nonetheless, until a more definite pronouncement is forthcoming, it remains the law of this Circuit that we will give weight to the EEOC's interpretations.

ing is substantially impaired, we consider the following factors:

 (A) The geographical area to which the individual has reasonable access;

 (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

 (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii) (1997).

■■■ Thus, the question for our review is whether the evidence presented, liberally construed, supports the finding that Muller was foreclosed from the class of jobs including correctional officer. "An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." *Heilweil v. Mount Sinai Hospital*, 32 F.3d 718, 723 (2d Cir.1994). It is undisputed that Muller could not work as a corrections officer at Midstate under prevailing conditions. Muller seeks to define the applicable class of jobs as "correctional officer" and further argues that his disability prevents him from working as a correctional officer in any facility. Although the evidence supports this conclusion, precedent indicates that Muller's class of jobs cannot be defined so narrowly.

■■■■ The position of correctional officer constitutes a single, particular job, and a limitation on a single, particular job cannot constitute a substantial limitation of the major life activity of working. *See Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 383–84 (2d Cir.1996).

By way of comparison, courts have held that (i) a disability that precludes piloting an airplane does not impair working because the relevant class of jobs includes ground trainer, flight instructor, and a management or administrative employee of an airline, *see Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1370–71 (11th Cir. 1998); (ii) an inability to work as a police officer is insufficient to establish impairment of working, *Miller v. City of Springfield*, 146 F.3d 612, 615 (8th Cir.1998); *see Daley v. Koch*, 892 F.2d 212, 215 (2d Cir. 1989) (reaching same result as *Miller* under Rehabilitation Act); and (iii) an inability to work as a firefighter does not suffice because firefighting does not constitute a "class of jobs." *Bridges v. City of Bossier*, 92 F.3d 329, 334–36 (5th Cir.1996); *see Welsh v. City of Tulsa*, 977 F.2d 1415, 1416–20 (10th Cir.1992) (reaching same result as *Bridges* under Rehabilitation Act).

Muller argues that his working ability is limited because he is unable to work in any environment where there will be cigarette smoke or environmental irritants. DOCS, in reply, notes that Muller has been employed as a salesman, bank employee, and substitute teacher during the pendency of this litigation. DOCS also points out that Muller would be qualified to work as a security guard in an office building or as a guard at the smoke-free county jail. Either of these two jobs would fit into a properly defined class of jobs that includes correctional officer because each seems to utilize "similar training, knowledge, skills or abilities" as the position of correctional officer. *See* 29 C.F.R. § 1630.2(j)(3)(ii)(B). Muller presented no evidence that he was precluded from jobs other than correctional officer in his geographic area. His failure to do so, and his insistence that his class of jobs is limited to correctional officer, compels our holding that there was insufficient evidence before the jury for it to have concluded that Muller was substantially limited in his major life activity of working.

### B. Sufficiency of evidence of breathing impairment

██ DOCS argues that Muller cannot be regarded as being impaired in his breathing because the evidence established that he was active outside of work at Midstate, participated in many sports and worked as a member of the military reserves. In addition to the facts recounted above, Muller's evidence regarding his breathing impairment included the following: The jury was presented with testimony of a medical expert and two doctors who had treated Muller's asthma, all of whom testified that Muller's asthma could be triggered by any number of environmental irritants. Muller's medical expert testified that Muller's lung function diminished 45% when a control solution of saline was introduced, which indicates that "any irritants could be expected to have very significant decreases in this person's lung capacity." Moreover, this expert stated that the test results "were consistent with the significant component of underlying reactive airways disease with a clearly reversible component, and supports a diagnosis of environmental sensitivities that the patient had demonstrated by history to cigarette exposure in the workplace." Muller's evidence included only one encounter with an irritant that triggered an asthmatic episode outside of work. Muller testified that, while on military reserve duty, he had a reaction to a petroleum-based smoke used by the military. Other than that, Muller testified that he felt "pretty good" outside of work when he used his inhalers.

██ We conclude that Muller's proof of his breathing impairment was deficient. As the Supreme Court clarified in *Sutton*, we must evaluate Muller's disability with reference to the applicable corrective measures, in this case, his inhalers and other medications. *See* 119 S.Ct. at 2143. Thus, the jury was precluded from speculating about how severe Muller's asthma would be but for his medications. Other than Muller's difficulties while at work at Midstate, what we are left with is testimony that Muller was physically active outside of work, that he could potentially have severe reactions to environmental irritants, and that, on one occasion, he did have such a reaction while working at a military base.

We find that this case is similar to *Heilweil*, in which we found that the plaintiff's "ability to breathe restricted her only in a limited way, and did not bar her from exercising." 32 F.3d at 723. Despite Heilweil's respiratory problems while working at her place of employment and her asthma, this Court concluded that Heilweil was not substantially limited in her ability to breathe. *See id.* Although we recognize that Muller presented evidence that his asthma was allergen-induced, for which exercise is a prescribed treatment, we believe that his substantial physical activity without encountering debilitating allergens cuts against his claim of disability. Simply put, there is not enough evidence of off-the-job breathing problems to find a substantial limitation of that life activity.

Nor is Muller's expert testimony alone enough to establish a substantial impairment. Muller's expert presented evidence of the nature of the condition and opined that irritants *might be expected* to produce an adverse effect on Muller's breathing. Without actual evidence of difficulty outside of work, however, we will not speculate on the severity of a disability or the types of allergens that Muller might encounter on a daily basis.

\* \* \* \* \* \*

██ At oral argument, we requested that the parties brief the question of whether the jury's verdict should stand in its entirety if we were to affirm the judgment based solely on the retaliation finding. Having reviewed these submissions, we believe that the jury's full award, as well as the district court's equitable awards of reinstatement and back pay, may be justified solely on the retaliation finding. As to the former, DOCS argues

that the jury's retaliation finding could have only been based on Muller's discharge because Muller's retaliation claim and the court's jury instructions were limited to a retaliatory discharge claim. Accordingly, it argues, we must remand for recalculation of damages. This contention is meritless: the court instructed the jury on several occasions that Muller's retaliation claim was not limited to his discharge but could include any adverse actions throughout his employment. DOCS did not request that the jury apportion its verdict between the retaliation claim and the discrimination claims, and it is therefore appropriate to find that the jury intended Muller to receive the full amount in compensation for his injury, regardless of the legal provision violated.

With regard to the equitable relief, reinstatement and back pay may be ordered to remedy unlawful retaliation. *See* 42 U.S.C. §§ 12203(c), 12117(a). There is nothing in the district court's discussion to indicate that it was basing its equitable relief solely on the finding of discrimination. While there may be some question regarding the authority of the district court to include in its injunction an order requiring DOCS to provide a smoke free environment as relief responsive to Muller's retaliation claim, DOCS is under an independent state statutory obligation to "provide nonsmoking employees with a smoke-free work area." N.Y. Pub. Health Law § 1399–*o*(6)(a) (McKinney 1990). Moreover, we take notice of the new policy of DOCS designating non-residential areas of New York State prisons as smoke free on January 1, 2000 and the remainder of the interior of prison facilities smoke free after January 1, 2001. *See Smoking to Be Banned In Prisons by 2001*, N.Y. Times, July 21, 1999, at B6. Because the district court's order requiring Muller's reinstatement required no more than DOCS' compliance with state law and its own incipient policy, we see no need to disturb this aspect of the injunction.

**CONCLUSION**

In accordance with the foregoing, the judgment of the district court, including all relief granted therein, is affirmed as supported by the retaliation finding.