DIANE P. WOOD, Circuit Judge,
dissenting.
I regret that I cannot join the majority’s opinion, despite the fact that there are significant points of agreement between us. The majority and I agree that, as the opinion puts it, there is no per se rule for ADA plaintiffs to the effect that they cannot prevail without quantitative evidence of the precise characteristics of the local job market. No one would quarrel with the idea that such quantitative, statistical evidence may often be useful, but the question in the case before us is whether these plaintiffs can survive summary judgment without it. No, the majority replies, and it goes on to speculate that statistical evidence is almost always necessary. I take issue with both propositions: the conclusion in this case, and the broader statement. Specifically, on this record I cannot agree that the Equal Employment Opportunity Commission had “no” evidence tending to show what class or range of jobs was at issue here — that is, the class of jobs, or broad range of jobs, from which persons with the assumed disability Rockwell had identified would be excluded. To the contrary, the Commission did have evidence, of the most concrete kind imaginable, and its evidence easily met the legal standards with respect to this element. I would find that the EEOC and the claimants are entitled to a trial on their ADA claims to resolve the remaining, and very troubling, issues in this case.
The debate we are having fits within the structure of an ADA case as follows. A person must first either have a disability, or have a history of a disability, or be regarded as having a disability, in order to be entitled to protection under the Act. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 478, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); 42 U.S.C. § 12102(2). In the present case, everyone agrees that the claimants, despite the score they received on the nerve conduction tests, had no present disability. Instead, Rockwell believed that people whose nerve conduction tests produced scores above a certain level were more likely to develop cumulative trauma disorders such as carpal tunnel syndrome. (Athough it is unimportant to the case in its present posture, I note that this as *1019 sumption was at best highly dubious, and certainly a contested point of fact. And it is not at all clear to me that as a matter of law the ADA permits an employer to refuse to hire a person who is fully qualified to perform certain work, simply because that individual might at some unspecified time in the future develop a physical or other disability that would render her unable at that later date to meet the employer’s reasonable expectations. This smacks of exactly the kind of speculation and stereotyping that the statute was designed to combat.) Rockwell then took matters one step further and decided to treat the claimants as if they already had the feared disorders; as such, it decided to exclude them from all jobs that would be unavailable to such people.
This leads us to the second step. Not every impairment is a protectable disability under the statute; the statute covers only those impairments that substantially limit a major life activity. Sutton, 527 U.S. at 481, 119 S.Ct. 2139; 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g). When, as in this case, we are dealing with a perceived disability rather than an actual disability, the test becomes whether the employer mistakenly believes either (1) that an unimpaired person has an impairment that substantially limits a major life activity, or (2) that an actual but non-limiting impairment substantially limits a major life activity. Sutton, 527 U.S. at 489, 119 S.Ct. 2139. The major life activity at issue here, as is often the case, is the activity of working. In order to show that the disability these claimants supposedly had was one that fell within the scope of the statute, the EEOC had to show that it left them “significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.” 29 C.F.R. § 1630.2(j)(3)(i). The standards applicable to an actual disability apply equally in a perceived-disability case: the question is whether, if the claimants had actually had the disabilities the employer regarded them as having, the claimants would have been significantly restricted in their ability to perform either a class of jobs or a broad range of jobs in various classes. See Moore v. J.B. Hunt Transport, Inc., 221 F.3d 944, 954 (7th Cir.2000). Rockwell, through its motion for summary judgment, imposed on the Commission the obligation to produce evidence in opposition to the motion that would have permitted a trier of fact to conclude that either a class or a broad range of jobs was so_ affected. In my view, the Commission met that burden.
It did so in a pragmatic way, rather than through the use of statistics. It pointed out that the record contains concrete information about the characteristics of the jobs Rockwell thought these people could not perform: that is, the job requirements of the four specific positions from which Rockwell excluded them. I certainly agree with the majority that pointing to the requirements of a specific job will not always be enough to show that a broad range of jobs or a class of jobs is at issue. If the job in question calls for highly idiosyncratic skills — the ability to work one specific kind of machine, the ability to operate one kind of computer program, or the ability to work a certain time shift, for example' — the fact that a person does not have those skills would tell a court little or nothing about whether the set of qualifications for the job in question was typical of a class or broad range of jobs. On the other hand, to take an extreme example at the other end of the spectrum, if the only qualification for the job was the ability to read and write, then it is obvious that a person who was unsuited for that job would be equally unsuited for a class or broad range of jobs. In such a case, it would be absurd to require statistical evidence showing how many jobs required literacy. With this much, I believe that the majority and I are still in agreement. It is “obvious,” to use the majority’s word, that a broad range of jobs requires literacy, and thus it would be pointless to insist that a vocational expert prepare a report showing that 95% of the jobs in a given area *1020 would be foreclosed to a person lacking such a qualification.
The problem is that the discussion so far simply defines the end-points of a line ranging from the greatest degree of particularity to the greatest generality of job characteristics. At some point between those extremes, additional evidence beyond the criteria of the job(s) from which the applicant is excluded will become necessary to show that the exclusion affects an entire class of jobs or a broad range of jobs. The problem posed by this case is where to draw that line, and according to what criteria.
In my view, the starting point for analysis is appropriately the job or jobs from which the employer is excluding the allegedly disabled individual. A court should look at the job skills that the employer demands for that job or jobs and determine how specific to the employer’s own workplace they are. In general, the more particular the job requirements, the more necessary it will be for a plaintiff to present demographic evidence that shows that those requirements are in fact found in enough jobs to matter for ADA purposes. But if the job requirements include only a list like a high school diploma, the ability to lift more than 30 pounds, the ability to use power tools, the ability to perform frequent repetitive motions (without specifying the particular motion needed), and regular attendance, they are general enough to describe a broad range of jobs, or a certain class of unskilled work. A trier of fact can tell the difference between generalized criteria that will cut across a broad range of jobs, and specialized criteria that are employer and workplace-specific, whether or not a vocational expert tells it how many thousands of jobs in the relevant geographic area have similar requirements. It is also appropriate, in this context, to see how many jobs the particular employer thought were affected by the perceived disability: just one or two, or a broad range? The Commission introduced evidence showing that 90% of the entry-level unskilled jobs at Rockwell were off limits to the applicants here. That evidence also gave an objective view of how widely Rockwell’s exclusionary practice was sweeping.
This point can be further illustrated by comparing the impairments involved in cases in which this and other circuits have allowed a claimant to go forward without requiring demographic evidence with the impairments involved in eases in which courts have suggested that demographic evidence would be necessary. This court has held that an impairment that prohibited the claimant from making repetitive motions with her right hand raised a triable issue of fact as to whether she was disabled, see DePaoli v. Abbott Laboratories, 140 F.3d 668, 673 (7th Cir.1998), as did an impairment that prevented performing overhead work, heavy lifting, and pushing and pulling out from the body, see Cochrum v. Old Ben Coal Co., 102 F.3d 908, 911 (7th Cir.1996). Accord Best v. Shell Oil Co., 107 F.3d 544, 548 (7th Cir.1997) (truck driver whose employer perceived his bad knee as prohibiting him from driving trucks with a clutch or with a certain common seat configuration was regarded as disabled under the ADA); Wellington v. Lyon County School Dist., 187 F.3d 1150, 1155 (9th Cir.1999) (plaintiff allowed to go forward based on evidence of carpal tunnel syndrome which prevented him from performing work involving metal fabrication, welding, heavy activities, carpentry, or the use of a variety of tools to do maintenance and repairs); see also 29 C.F.R. Part 1630 Appendix § 1630.2Q) (“an individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working”). In contrast, the cases cited by the majority in which courts have suggested that demographic evidence is necessary have involved much more specialized restrictions. See Santiago Clemente v. Executive Airlines, Inc., 213 F.3d 25, 32 (1st Cir.2000) (flight attendant could not fly on non-pressurized planes; could do a variety of ground jobs for employer or fly on pressurized planes); Broussard v. Univer *1021 sity of California at Berkeley, 192 F.3d 1252, 1259 (9th Cir.1999) (animal lab technician with carpal tunnel syndrome could not perform duties of caring for mice in one lab; one of accommodations employee sought was transfer to working with different animals); Muller v. Costello, 187 F.3d 298, 313 (2d Cir.1999) (corrections officer with asthma precluded from working in smoky environment; could still work in smoke-free county jail); Doren v. Battle Creek Health Sys., 187 F.3d 595, 598 (6th Cir.1999) (pediatric nurse prohibited from heavy lifting or working more than 8-hour shift; no evidence that she was excluded from any pediatric job by lifting requirement, or of how many pediatric nursing jobs in area required longer than 8-hour shift); Bolton v. Scrivner, Inc., 36 F.3d 939, 943-44 (10th Cir.1994) (employee faced “limitations” on standing, walking, and lifting ovei'head, but medical report gave no indication of extent of restrictions). In my view, the disability that Rockwell perceived the claimants in this case as having — a disability which, in Rockwell’s estimation, prohibited these workers from performing frequent repetitive motions or from using vibratory power tools — is much more similar to a restriction on repetitive motion with one hand or a restriction on overhead work than it is to a restriction on flying in non-pressurized planes, or working in a smoky environment, or caring for certain mice.
I see nothing to be gained by having vocational experts routinely appear in ADA cases solely for the purpose of testifying that a broad range of jobs require the ability to lift 30 pounds, or the ability to perform repetitive motions. Indeed, as noted above, in DePaoli we found that a disability that prevented the plaintiff from performing repetitive motions with her right hand was protected under the Act. Obviously, in this case we cannot precisely compare the severity of the disability suffered by the plaintiffs with that of plaintiff DePaoli, for the simple reason that these people were not yet disabled at all. Rockwell merely perceived them as disabled because it thought that they might become so impaired by repetitive stress injuries in the future that they would not then be able to do the job. For analytic purposes now, as noted above, we must approach this case as if these plaintiffs were already suffering from injuries that kept them away from frequent repetitive motions and the use of vibratory power tools. Once that is done, the sufficiency of the Commission’s evidence to defeat summary judgment becomes clear.
I would reverse and remand for further proceedings, and thus I respectfully dissent.