224 F.3d 190 (3rd Cir. 2000)
 JEFFREY D. LAVIA,
v.
COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF CORRECTIONS, STATE CORRECTIONAL INSTITUTION AT GREENE, Appellant
 No. 99-3863
 UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
 Argued: May 9, 2000
Filed August 8, 2000
 
 On Appeal from the United States District Court for the Western District of Pennsylvania District Judge: Honorable Donald E. Ziegler (D.C. Civ. No. 99-cv-00445)[Copyrighted Material Omitted][Copyrighted Material Omitted]
 Attorneys for Appellant: D. Michael Fisher Attorney General John G. Knorr, III (Argued) Chief Deputy Attorney General Chief, Appellate Litigation Section Calvin R. Koons Senior Deputy Attorney General Kemal A. Mericli Senior Deputy Attorney General Office of the Attorney General 15th Floor, Strawberry Square Harrisburg, PA 17120
 Attorney for Appellee: John A. Adamczyk (Argued) 114 Smithfield Street Pittsburgh, PA 15222
 Before: GREENBERG, McKEE and GARTH, Circuit Judges
 OPINION FOR THE COURT
 GARTH, Circuit Judge.
 
 
 1
 We are called upon to decide whether, in enacting Title I of the Americans with Disabilities Act ("ADA"), Congress abrogated the States' Eleventh Amendment sovereign immunity from suit pursuant to a valid exercise of its S 5 power to enforce the Fourteenth Amendment.
 
 
 2
 In Kimel v. Florida Board of Regents, 120 S. Ct. 631 (2000), the Supreme Court recently held that the Age Discrimination in Employment Act ("ADEA") was not a valid exercise of Congress' S 5 enforcement power and as such did not validly abrogate the States' Eleventh Amendment immunity. In light of Kimel, and based on the terms of the statute and its legislative history, we hold that the ADA is not a valid exercise of Congress' S 5 power and accordingly does not abrogate the States' Eleventh Amendment immunity from suit. To the extent that the District Court sustained Congress' authority to use its S 5 power to enforce the Fourteenth Amendment by enacting Title I of the ADA, we will reverse the District Court's decision.
 
 I.
 
 3
 Lavia's complaint alleges that he began working for the Department of Corrections in March 1991, and was then transferred to the State Correctional Institute at Greene. Pennsylvania. In 1995, Lavia was promoted to Corrections Officer II. In July 1996, Lavia suffered from a seizure and was diagnosed with CNS Vasculitis of the brain. Lavia contends that his condition rendered him "disabled," or that he was perceived as disabled within the meaning of the ADA, 42 U.S.C. SS 12101 et seq. Against the recommendation of his doctor, Lavia returned to work. He alleges that he was then harassed at work because of his disability. Lavia continues to suffer the effects of his medication that, he claims, cause psychotic reactions. Seemingly as a result of these side effects, Lavia engaged in unspecified conduct at work that resulted in disciplinary action by the Department. In May 1997, Lavia was demoted to Corrections Officer I, and then in August of 1997 he was terminated.
 
 
 4
 Lavia brought an action against the Commonwealth of Pennsylvania, Department of Corrections, State Correctional Institute at Greene (hereinafter "the Commonwealth" or "the State") seeking reinstatement, damages and other relief under the ADA, the Vocational Rehabilitation Act, ("Rehabilitation Act") 29 U.S.C. SS 701 et seq., and the Pennsylvania Human Relations Act ("PHRA"), Pa. Stat. Ann., tit. 43, SS 951 et seq . The Commonwealth moved to dismiss, arguing that it was immune from suit under the Eleventh Amendment. On September 29, 1999, the District Court dismissed Lavia's claim with respect to the PHRA, holding that the Eleventh Amendment bars consideration of state law claims. The District Court, however, declined to dismiss Lavia's federal claims under the ADA and the Rehabilitation Act, holding that in each of those federal acts Congress had validly abrogated the States' Eleventh Amendment immunity.[1]
 
 
 5
 On October 18, 1999, the Commonwealth appealed, challenging only Lavia's claim under the ADA.[2] Such an order is immediately appealable under the collateral order doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541 (1949); Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139 (1993); Acierno v. Cloutier, 40 F.3d 597 (3d Cir. 1994) (en banc). As the issue presented is solely a question of law, this court's review is plenary. See Kimel v. Florida Bd of Regents, 120 S. Ct. 631 (2000).
 
 II.
 
 6
 Generally, states are immune from suit by private parties in the federal courts. The Eleventh Amendment of the United States Constitution provides:
 
 
 7
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 
 
 8
 U.S. Const. amend. XI. Although this case involves a suit brought by a citizen against his own state, the Eleventh Amendment has long been interpreted to prohibit such suits as well. See, e.g. Kimel, 120 S. Ct. at 640 ("[F]or over a century now, we have made clear that the Constitution does not provide for federal jurisdiction over suits against non-consenting States." (citing e.g., College Sav. Bank v. Florida Prepaid Postsecondary Ed. Expense Bd., 527 U.S. 666, 669 (1999); Seminole Tribe v. Florida, 517 U.S. 44, 54 (1996)); Hans v. Louisiana, 134 U.S. 1, 13 (1890) ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent."). Moreover, the type of relief sought is irrelevant to the question of Eleventh Amendment immunity. See Seminole Tribe , 517 U.S. at 58.
 
 
 9
 Because the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, see Pa. Stat. Ann., tit. 71 S 61, it shares in the Commonwealth's Eleventh Amendment immunity. Such immunity, however, may be lost in one of two ways: (1) if the Commonwealth waived its immunity; or (2) if Congress abrogated the States' immunity pursuant to a valid exercise of its power. See College Sav. Bank, 527 U.S. at 670; Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 240-41 (1985).
 
 Waiver
 
 10
 A state may waive its Eleventh Amendment immunity and thus subject itself to suit by private parties in federal court. See College Sav. Bank, 527 U.S. at 670. In this case, the Commonwealth did not waive its Eleventh Amendment immunity. First, Pennsylvania's constitution states that "[s]uits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct." Pa. Const. Art. 1, S 11 (emphasis added). The Pennsylvania legislature has, by statute, expressly declined to waive its Eleventh Amendment immunity. See Pa. Stat. Ann., tit. 42 S 8521(b) ("Nothing contained in this subchapter [on actions against Commonwealth parties in civil actions and proceedings] shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States.").
 
 
 11
 The only argument Lavia presents that the Commonwealth has waived its immunity is based on a December 17, 1997, Management Directive published by the Governor's Office in which compliance with the ADA and the Rehabilitation Act are stated as objectives.[3] This Management Directive, however, cannot be held to constitute a waiver of the Commonwealth's immunity. First, it is not a waiver made by the legislature -- as required by Pennsylvania's Constitution. Second, the Management Directive itself limits enforcement "in accordance with applicable federal or state acts or regulations." The applicable state laws do not indicate that the Commonwealth has waived its Eleventh Amendment immunity. Thus, the Commonwealth has not lost its Eleventh Amendment immunity by virtue of waiver.
 
 Congressional Abrogation
 
 12
 The second means by which the States' Eleventh Amendment immunity may be lost is by valid congressional abrogation. See College Sav. Bank, 527 U.S. at 670. There is a "simple but stringent test" to determine whether Congress has abrogated state immunity under the Eleventh Amendment. Dellmuth v. Muth, 491 U.S. 223, 228 (1989). In this two-part test, a court must first consider "whether Congress has `unequivocally expresse[d] its intent to abrogate the immunity;' and second, whether Congress has acted `pursuant to a valid exercise of power"' in abrogating state immunity. Seminole Tribe, 517 U.S. at 55 (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)); see also Kimel, 120 S. Ct. at 634-35; Atascadero, 473 U.S. at 242.
 
 
 13
 With respect to the ADA, Congress has unequivocally fulfilled the first requirement by expressly stating its intent to abrogate the states' Eleventh Amendment immunity. Section 12202 of the ADA provides that "[a] State shall not be immune under the [E]leventh [A]mendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. S 12202.[4] Therefore, the only remaining question is whether, in attempting to abrogate the States' immunity for purposes of ADA litigation, Congress has acted within the proper exercise of its power.
 
 
 14
 Although Congress has the authority to enact legislation under its Article I powers, including its power under the Commerce Clause, such authority does not permit Congress to nullify the States' Eleventh Amendment immunity. See Seminole Tribe, 517 U.S. at 47; see also Kimel, 120 S. Ct. at 643; College Sav. Bank, 527 U.S. at 672; Alden v. Maine, 527 U.S. 706, 713-14 (1999). As such, if the ADA were based solely on Congress' Article I powers, Lavia would not be able to sue the Commonwealth of Pennsylvania in federal court.
 
 
 15
 Congress does, however, have the authority to abrogate the States' Eleventh Amendment immunity under its S 5 power to enforce the Fourteenth Amendment. See U.S. CONST. amend. XIV, S 5; Kimel, 120 S. Ct. at 644; Seminole Tribe, 517 U.S. at 58-59 (citing Fitzpatrick v. Bitzer, 427 U.S. 445 (1976)); College Sav. Bank, 527 U.S. at 672; Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank, 527 U.S. 627 (1998); Alden, 527 U.S. at 713-14. In relevant part, the Fourteenth Amendment provides:
 
 
 16
 Section 1 . . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
 
 
 17
 To be a valid exercise of S 5 power, Congress must "identify conduct transgressing the Fourteenth Amendment's substantive provisions, and must tailor its legislative scheme to remedying or preventing such conduct." Florida Prepaid, 527 U.S. at 639. "Congress' power under S 5 extends only to `enforc[ing] the provisions of the Fourteenth Amendment." City of Boerne v. Flores, 521 U.S. 507, 519 (1997). This power extends not only to prohibiting conduct that is itself unconstitutional under the Fourteenth Amendment, but also to conduct that, although not itself unconstitutional, is deemed necessary in order to remedy or prevent unconstitutional conduct. See Kimel, 120 S.Ct. at 644. This S 5 power, designed to serve a remedial and corrective purpose rather than to impose new substantive rights, although broad, is not unlimited. See id. (stating that Congress "`has been given the power "to enforce," not the power to determine what constitutes a constitutional violation."') (quoting City of Boerne, 521 U.S. at 519).
 
 
 18
 Moreover, because the Fourteenth Amendment provides strictures against the State as distinct from societal or community actions, any exercise of the S 5 power is confined to redressing state action, and private actions are therefore irrelevant in the present context. See e.g., United States v. Morrison, 120 S. Ct. 1740, 1756 (2000) ("recognizing "the time-honored principle that the Fourteenth Amendment, by its very terms, prohibits only state action . . . . `That Amendment erects no shield against merely private conduct, however discriminatory or wrongful.") (quoting Shelley v. Kraemer, 334 U.S. 1, 13 and n.12 (1948); see also Romer v. Evans, 517 U.S. 620, 628 (1996); Lugar v. Edmondson Oil Co., 457 U.S. 922, 936 (1982); United States v. Harris, 106 U.S. 629, 639 (1883); Virginia v. Rives, 100 U.S. 313, 318 (1879) ("[T]hose provisions of the [F]ourteenth [A]mendment have reference to State action exclusively, and not to any action of private individuals") (internal quotations omitted)); United States v. Cruikshank, 92 U.S. 542, 554 (1875).
 
 III.
 Title I of the ADA
 
 19
 In order to determine whether the ADA is properly characterized as a remedial enforcement statute, we first examine its scope. Congress "invoke[d] the sweep of congressional authority, including the power to enforce the [F]ourteenth [A]mendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. S 12101(b)(4). In doing so, Congress clearly defined the ADA's purpose[5] and made extensive findings with respect to the discrimination suffered by the disabled in the United States.[6] Title I of the ADA covers all public and private employers, employment agencies and labor unions, excepting small businesses and the federal government. See id. SS 12111(2), (5), (7). It protects those qualified disabled individuals "who, with or without reasonable accommodation, can perform the essential functions of the employment position," id S 12111(8), from discrimination in "the hiring, advancement, or discharge of employees, employment compensation, job training and other terms, conditions, and privileges of employment." Id . S 12112(a).
 
 
 20
 Prohibited discrimination under Title I of the ADA is not limited to purposeful discrimination, but rather extends, for example, to "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination." Id S 12112(b)(3). Further, it includes the failure to make "reasonable accommodation" to an applicant or employee's known physical or mental limitations unless such accommodation would impose an "undue hardship" on its business. See id. S 12112(b)(5)(A). In turn, an "undue hardship" is defined as "an action requiring significant difficulty or expense, when considered in light of [certain enumerated] factors." Id at S 12111(10)(A).[7] Such reasonable accommodations might include, although are not limited to, altering the physical facilities, restructuring jobs and work schedules, providing readers, interpreters or other such resources. See id. S 12111(9).
 
 
 21
 Additionally, Title I prohibits the use of standard tests and selection criteria that "screen out or tend to screen out" persons with disabilities. Id. S 12113(a). Such screening mechanisms are only permissible if they are both "job- related" and "consistent with business necessity" and that the work cannot be accomplished by a reasonable accommodation. Id. Depending upon the context, the ADA also places the burden on the employer to prove that its conduct was compelled by "business necessity." Id. S 12113(a);[8] and requires the employer to accommodate the disabled and to provide "reasonable" accommodations, even if there is a legitimate, rational reason for not wanting to do so. Because the scope of Title I's coverage is so broad, Congress seemingly found it necessary to specifically exclude from its coverage certain screening techniques used to eliminate illegal drug and alcohol usage, and, in certain circumstances, those individuals who pose a significant health risk to others. See id at S 12114(a) and (c); S 12113(b) and (d)(2).
 
 
 22
 Relationship between ADA provisions and the Equal Protection Clause
 
 
 23
 Having identified the scope of the ADA's intended remedial purpose, we look to whether the conduct targeted by the ADA constitutes either a direct violation of the Fourteenth Amendment, or falls within the slightly "broader swath" of conduct that can be regulated in order to prevent violations of the Fourteenth Amendment. See Kimel, 120 S. Ct. at 644 (citing City of Boerne, 521 U.S. at 518). "It is for Congress in the first instance to `determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment' [and Congress'] . . . conclusions are entitled to much deference." City of Boerne, 521 U.S. at 536 (quoting Katzenbach v. Morgan, 384 U.S. 641, 651 (1966)). Determining whether conduct violates the Fourteenth Amendment, however, is the responsibility of the judiciary and not of the legislature. See id. As such, Congress' own characterization of the ADA as an enforcement statute protecting the Fourteenth Amendment is not dispositive on the matter.
 
 
 24
 The Supreme Court explained in City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432 (1985), that under the Equal Protection Clause of the Fourteenth Amendment, the mentally disabled are neither a suspect nor a quasi-suspect class. See id. at 442-47; see also, Heller v. Doe, 509 U.S. 312, 321 (1993).[9] Thus, legislation affecting their interests need only pass a rational basis test, which is the least demanding scrutiny required by the courts.[10] Under rational basis scrutiny, state action will survive as long as it merely furthers a legitimate state interest. That is:
 
 
 25
 [i]f the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations -- illogical, it may be, and unscientific.
 
 
 26
 Dandridge v. Williams, 397 U.S. 471, 485 (1970) (internal citations and quotations omitted).
 
 
 27
 Kimel instructed, in the context of age discrimination -- which is subject to rational basis scrutiny -- that "States may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest. . . . In contrast, when a State discriminates on the basis of race or gender [that is, a suspect or quasi-suspect class] we require a tighter fit between the discriminatory means and the legitimate ends they serve." Kimel, 120 S. Ct. at 646 (citations omitted). Similarly, here in the context of disability discrimination, a State's decision to deny employment based upon a consideration of an individual's disability as a generalization of their other qualities, abilities, or characteristics will not offend the Equal Protection Clause and its rational basis test, provided that it is rationally related to a legitimate state interest and is not the result of purposeful discrimination. See Washington v. Davis, 426 U.S. 229, 239-40 (1976). As the Supreme Court in Kimel stated, "the [C]onstitution does not preclude reliance on such [age disqualification] generalizations. That age [in Kimel] proves to be an inaccurate proxy in any individual case in irrelevant." Kimel, 120 S. Ct. at 635.
 
 
 28
 In comparing the protections guaranteed to the disabled under the ADA, see text supra, with those limited protections guaranteed under the rational basis standard of the Fourteenth Amendment, it is clear that the former imposes far greater obligations and responsibilities on the States than does the latter. As such, the ADA cannot be seen as enforcing direct violations of the Fourteenth Amendment. The mere fact, however, that the ADA proscribes more conduct than what is prohibited by the Constitution is not itself fatal. Indeed, the Supreme Court recently stated:
 
 
 29
 Congress' S 5 power is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment. Rather Congress' power `to enforce' the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text.
 
 
 30
 Kimel, 120 S. Ct. at 644 (citing City of Boerne, 521 U.S. at 518) (emphasis added). As such, "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." City of Boerne, 521 U.S. at 518. This S 5 power, however, must still enforce a constitutional violation and cannot "`decree the substance of the Fourteenth Amendment's restrictions on the States."' Kimel, 120 S. Ct. at 644 (quoting City of Boerne, 521 U.S. at 519).
 
 
 31
 Recognizing that "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern," the Supreme Court has held that "Congress must have wide latitude in determining where it lies." City of Boerne, 521 U.S. at 520. Nevertheless, in order to constitute a valid exercise of S 5 power, the Supreme Court still requires "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." Id. Indeed, several Supreme Court decisions have recently held that Congress has exceeded the latitude of its S 5 powers. See e.g., City of Boerne v. Flores, 521 U.S. 507 (1997); Florida Prepaid Postsecondary Ed. Expense Bd. v. College Sav. Bank, 527 U.S. 627 (1998); United States v. Morrison, 120 S. Ct. 1740 (2000).
 
 
 32
 For example, in City of Boerne v. Flores, 521 U.S. 507 (1997), the Supreme Court held that the Religious Freedom Restoration Act ("RFRA") was "so out of proportion to a supposed remedial or preventive object that it [could not] be understood as responsive to or designed to prevent unconstitutional behavior" because there was only "anecdotal evidence" and no finding of a "widespread pattern of religious discrimination in this country." Id. at 531-32. As such, Congress exceeded its S 5 enforcement power in enacting the RFRA.
 
 
 33
 Similarly, in Florida Prepaid Postsecondary Ed. Expense Bd. v. College Sav. Bank, 527 U.S. 627 (1998), the Supreme Court held that in enacting the Patent Remedy Act, Congress had exceeded its S 5 powers, noting that Congress had "identified no pattern of patent infringement by the States, let alone a pattern of constitutional violations." Id at 640. Indeed, rather than trying to remedy unconstitutional conduct by the states, the Court determined that Congress' true objective was to "provide a uniform remedy .. . and to place States on the same footing as private parties under that regime." Id at 647-48.[11]
 
 
 34
 In United States v. Morrison, 120 S. Ct. 1740 (2000), the Supreme Court held that the civil remedy provision of the Violence Against Women Act, ("VAWA"), 42 U.S.C. S 13981 was not a valid exercise of S 5 enforcement power. In emphasizing that the Fourteenth Amendment prohibits only state action, and does not protect against wrongful conduct by private persons or entities, the Supreme Court concluded that because VAWA was directed "at individuals who have committed criminal acts motivated by gender bias" rather than proscribing state violations of the Fourteenth Amendment, it was not prophylactic legislation under S 5 that was congruent and proportionate to the state violations to be remedied. Id. at 1758. As such, the Court held that Congress exceeded its S 5 enforcement power in enacting VAWA. See id. at 1756-58.
 
 
 35
 As we have previously discussed, of special significance here, the Supreme Court held that Congress did not validly abrogate the States' Eleventh Amendment immunity in enacting the ADEA because its substantive provisions imposed burdens on state and local governments that were "disproportionate to any unconstitutional conduct that conceivably could be targeted by the Act." Kimel, 120 S. Ct. at 645. Even acknowledging that "[d]ifficult and intractable problems often require powerful remedies" and that it has "never held that S 5 precludes Congress from enacting reasonably prophylactic legislation," the Supreme Court nevertheless concluded that the ADEA was not "reasonably prophylactic legislation" but rather a redefinition of the States' substantive obligations with respect to the aged. Id. at 648. The Supreme Court explained that the ADEA, "through its broad restriction on the use of age as a discriminating factor, prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection, rational basis standard." Id. at 647. Moreover, even with the ADEA's defenses and exceptions to liability making its prohibitions less than absolute, it still remained "a far cry from the rational basis standard," and as such did more than merely enforce direct violations of the Fourteenth Amendment. Id.
 
 
 36
 The ADEA's legislative history, although revealing evidence of "substantial age discrimination in the private sector," failed to identify "any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violations." Id. at 649 (emphasis added). Private sector discrimination, however, is "beside the point" in a S 5 analysis which considers only state conduct. See id. Importantly, the Court explained, "Congress' failure to uncover any significant pattern of unconstitutional discrimination [by the States] confirms that Congress had no reason to believe that broad prophylactic legislation was necessary in this field." Id. at 650.[12] Therefore, the Supreme Court held that in enacting the ADEA, Congress did not abrogate the States' Eleventh Amendment immunity pursuant to a valid exercise of its S 5 enforcement powers.
 
 IV.
 
 37
 Prior to the Kimel decision, but after the decisions in College Sav. Bank v. Florida Prepaid Postsecondary Ed. Expense Bd., 527 U.S. 666 (1998), Florida Prepaid Postsecondary Ed. Expense Bd. v. College Sav. Bank, 527 U.S. 627 (1998) City of Boerne v. Flores, 521 U.S. 507 (1999) and Seminole Tribe v. Florida, 517 U.S. 44 (1996), several circuits had held that Congress validly abrogated the States' Eleventh Amendment immunity in enacting Title I of the ADA.[13] Serious doubts as to the viability of these decisions has been cast by the Supreme Court's recent decision in Kimel, 120 S. Ct. 631 (2000), to which we have previously referred.
 
 
 38
 Those cases emphasized the deference the courts should give to express Congressional findings of pervasive discrimination against the disabled and the ADA's stated remedial purpose. See, e.g., Martin v. Kansas, 190 F.3d 1120 (10th Cir. 1999); Coolbaugh v. Louisiana, 136 F.3d 430 (5th Cir. 1998) (quoting 42 U.S.C. S 12101(a) findings). Further, the Fifth Circuit emphasized that, in concluding that discrimination against the disabled was pervasive, Congress relied upon seven substantive studies and reports documenting discrimination against the disabled, as well as testimonial evidence of the same. See Coolbaugh, 136 F.3d at 436-37, 437 n.4 (quoting from legislative history). These studies and testimonial evidence -- it should be noted -- concerned societal discrimination and not discrimination by the States.
 
 
 39
 The Second Circuit's decision in Muller v. Costello, 187 F.3d 298 (2d Cir. 1999), for example, specifically references the "hundreds of hours [Congress spent] in hearings determining the scope of the problem and the best manner to address it;" the fact that the ADA was designed to "combat . . . irrational discrimination against persons with disabilities;" and Congress' finding that "individuals with disabilities are a discrete and insular minority" in concluding that the ADA was a "a proportionate and congruent response to the discrimination that Congress sought to prohibit." Id. at 308-09.[14] In siding with the other circuits which have so held, the Second Circuit explained that the ADA was an extension of the Rehabilitation Act, applying remedies based upon the anti-employment discrimination provisions of Title VII of the Civil Rights Act of 1964. Interestingly, unlike the Supreme Court's analysis in Kimel which focused on the lack of evidence of unconstitutional state discrimination, none of these earlier circuit court cases address the lack of widespread unconstitutional conduct by the states themselves. Instead, they refer only to pervasive societal discrimination in general.
 
 
 40
 Since the Supreme Court decided Kimel, only a few courts have again dealt with whether the ADA is a valid exercise of Congress' S 5 enforcement powers.[15] The Second Circuit applied, without explanation or analysis, its pre-Kimel decision in Muller v. Costello, 187 F.3d 298 (2nd Cir. 1999). See Kilcullen v. New York State Dep't of Labor, 205 F.3d 77 (2d Cir. 2000).[16] Similarly, in Davis v. Utah State Tax Comm'n, 96 F. Supp. 2d 1271 (D. Utah 2000), the District of Utah held that, bound by the Tenth Circuit pre-Kimel precedent of Martin v. Kansas, 190 F.3d 1120 (10th Cir. 1999), it was obliged to conclude that the States were not entitled to Eleventh Amendment immunity with respect to suits brought under Title I of the ADA. Davis explained, however, that even if it were not bound by Martin, even in light of Kimel its own independent review would nevertheless yield the same conclusion. See id (citing primarily to Judge Wood's dissent in Erickson, 207 F.3d at 953, discussed in text infra.).
 
 
 41
 The most penetrating analysis, however, has been made by the Seventh Circuit in Erickson v. Board of Governors, 207 F.3d 945 (7th Cir. 2000), and in Stevens v. Illinois Dep't of Transportation, 210 F.3d 732 (7th Cir. 2000).[17] The Seventh Circuit correctly noted that the ADA, like the ADEA and the RFRA, imposes upon the States far greater restrictions and obligations than does the rational basis standard of the Fourteenth Amendment by, for example, targeting an employer's "rational consideration of disabilities." Erickson, 207 F.3d at 949. Indeed, the Seventh Circuit went so far as to declare that "[b]ecause the ADA requires accommodation, forbids practices with disparate impact, and disregards the employer's intent, it is harder than the ADEA to characterize as a remedial measure" which is not as broad in its prohibitions. Id. at 951.
 
 
 42
 We, like the Seventh Circuit, and in light of Kimel, emphasize the absence of any evidence in the legislative history or in Congress' findings of pervasive violations of the Fourteenth Amendment by the States with respect to the disabled, to justify a prophylactic remedial enforcement measure that would abrogate the States' Eleventh Amendment immunity. In emphasizing the lack of evidence of unconstitutional state discrimination against the disabled, we note that virtually every state in the country has enacted its own legislation prohibiting discrimination against the disabled in employment,[18] and some have even enacted statutes advancing the explicit policy of encouraging employment of the disabled in state government positions.[19] Nor, as the Seventh Circuit concluded in Stevens v. Illinois Dep't of Transp., 207 F.3d 732 (7th Cir. 2000), is there any evidence "in the legislative record that those States which do not have [statutes encouraging employment of the disabled] are engaged in widespread discrimination against the disabled." Id. at 740.
 
 
 43
 We, along with the Seventh Circuit, acknowledge that at times States may falter in their efforts to eliminate discrimination against the disabled in employment. Nevertheless, we agree that the broad sweep of the ADA is out of proportion to the discrimination to be remedied.
 
 
 44
 Without more detailed findings concerning a nationwide pattern of arbitrary and illegitimate discrimination against the disabled by the States, the ADA cannot be viewed as a proportional and congruous response to the problem of state-perpetrated discrimination against the disabled. While the ADA's goal of eliminating discrimination may be a laudable aim for federal legislation, it is not one which serves the purpose of enforcing the protections provided by the Fourteenth Amendment.
 
 
 45
 Id. (citing City of Boerne, 521 U.S. at 519). Inasmuch as Congress is only authorized to exercise its S 5 power to remedy constitutional violations when it is the States themselves engaged in unconstitutional conduct and not private members of society and the community, and because there is no evidence of state violations, we hold that Congress did not validly abrogate the States' Eleventh Amendment immunity in enacting the ADA.
 
 
 46
 In challenging such a conclusion, Lavia references the Governors' Committee Reports which indicate that existing state laws have failed to adequately protect the disabled against discrimination. See Appellee's Supplemental Brief at 5 (citing HOUSE REP. N O. 101-485 (II), at 47 (1990), reprinted in 1990 U.S.C.C.A.N. 445.). These reports, however, cannot overcome the fact that they fail to indicate that the States themselves have unconstitutionally discriminated against the disabled. Indeed, much of the discrimination faced by the disabled to which Lavia refers either does not pertain to Title I concerning employment or is explained under rational basis scrutiny as constitutionally permissible under the Fourteenth Amendment.[20] Further, even if isolated instances of unconstitutional state discrimination in employment against the disabled existed, or if one particular state regularly violated the Equal Protection Clause, the Supreme Court has explained in Kimel that evidence of such unconstitutional conduct by one or even a few states is insufficient evidence of widespread State disregard of the Constitution to justify the ADA's abrogation of all States' immunity. See Kimel, 120 S. Ct. at 649.
 
 
 47
 The only contrary arguments that have been generates thus far in published courts of appeals decisions after Kimel, appear in the dissent in Erickson, 207 F.3d at 953.[21] Among other arguments set forth in the Erickson dissent, authored by Judge Wood, are: that a more stringent standard of review ("careful scrutiny") rather than a rational basis test should be utilized; that the disabled are to be distinguished from the aged; that the ADA incorporates a proportionality test required by the Constitution; and that state action may be implied from the states' involvement in many areas in which the disabled have faced discrimination. See id. Although those arguments are forceful and interesting, we are not persuaded that they call for a result different from the one we have reached.
 
 
 48
 Despite the latitude to be given to Congress, we are of the opinion that in enacting the ADA, Congress exceeded its S 5 enforcement power. Without any evidence of widespread discrimination against the disabled by the States, Congress attempted, by modeling the ADA after the civil rights laws dealing with race and sex discrimination, to expand and standardize the substantive protections guaranteed to the disabled. See H.R. REP. NO . 101-485 (III), at 26 (1990), reprinted in 1990 U.S.C.C.A.N. 449 ("The [ADA] completes the circle begun [by the Rehabilitation Act] with respect to persons with disabilities by extending to them the same civil rights protections provided to women and minorities beginning in 1964.") (House Judiciary Committee Report). Such substantive changes exceed Congress' S 5 power to enforce the Fourteenth Amendment which provides less protections and only rational basis scrutiny. As such, the ADA does not validly abrogate the States' Eleventh Amendment immunity because, like the ADEA, the ADA attempts to "effectively elevate[ ] the standard for analyzing [disability] discrimination to a heightened scrutiny." Kimel, 120 S. Ct. at 648.
 
 V.
 
 49
 Kimel's teachings, and the recent trend in Supreme Court jurisprudence with respect to S 5 power, impels us to reverse the District Court's decision with respect to Title I of the ADA and hold that Congress did not abrogate the States' Eleventh Amendment immunity pursuant to a valid exercise of its S 5 enforcement power. We will remand this case to the District Court for further proceedings to address Lavia's claim under the Rehabilitation Act.[22] See note 2 supra.
 
 
 
 NOTES:
 
 
 [1]
 The District Court relied on Martin v. Kansas, 190 F.3d 1120 (10th Cir. 1999); Muller v. Costello, 187 F.3d 298 (2nd Cir. 1999); Amos v. Maryland Dep't of Public Safety and Correctional Servs., 178 F.3d 212, 218 (4th Cir. 1999) judgment vacated en banc Dec. 28, 1999; Kimel v. Florida Bd of Regents, 139 F.3d 1426, 1433 (11th Cir. 1998), aff'd 120 S. Ct. 631 (2000) (addressing ADEA); Coolbaugh v. Louisiana, 136 F.3d 430, 438 (5th Cir.), cert. denied, 525 U.S. 819 (1998); Clark v. California, 123 F.3d 1267 (9th Cir. 1997); Crawford v. Indiana Dep't of Corrections, 115 F.3d 481, 487 (7th Cir. 1997), abrogated by Erickson v. Board of Governors of State Colleges and Universities for Northeastern Illinois Univ., 207 F.3d 945 (7th Cir. 2000) (addressing Title II of the ADA).
 Each of the cases, however, upon which the District Court relied have now been called into question by the Supreme Court's decision in Kimel v. Florida Bd of Regents, 120 S.Ct. 631 (2000). The Supreme Court held that in enacting the Age Discrimination in Employment Act ("ADEA"), Congress had not abrogated the States' Eleventh Amendment immunity pursuant to a valid exercise of its S 5 enforcement powers. Indeed, as discussed infra in text, the Seventh Circuit has already questioned the ongoing validity of its own Crawford decision with respect to Title II of the ADA in light of the Kimel decision. See Erickson v. Board of Governors of State Colleges and Universities for Northeastern Illinois Univ., 207 F.3d 945, 948 (7th Cir. 2000). Further, the Seventh Circuit held that, in light of Kimel, Congress did not validly abrogate the States' Eleventh Amendment immunity with respect to Title I of the ADA -- the very issue before us on this appeal. See id. at 952. See also Stevens v. Illinois Dep't of Transportation, 210 F.3d 732 (7th Cir. 2000).
 The Supreme Court has granted certiorari to address whether both Title I and Title II of the ADA are valid exercises of Congress' S 5 power. See University of Ala. at Birmingham Bd. of Trustees v. Garrett, 120 S. Ct. 1669 (2000). Two prior cases in which certiorari had also been granted to address these issues were later settled, and their appeals dismissed. See Alsbrook v. Arkansas, 184 F.3d 999 (8th Cir. 1999), cert dismissed Alsbrook v. Arkansas, 120 S.Ct. 1265 (U.S. March 1, 2000) (No. 99-423) (Title II of the ADA); Dickson v. Florida Dep't of Corrections, 139 F.3d 1426 (11th Cir. 1998), cert dismissed 120 S.Ct. 1236 (U.S. February 23, 2000) (No. 98-829). Hence, the Supreme Court has again granted certiorari, but has not decided this issue as yet.
 
 
 [2]
 We limit our review to whether Congress validly abrogated the States' Eleventh Amendment immunity under Title I of the ADA. We do not consider whether Congress validly abrogated the States' immunity under either Title II of the ADA or under the Rehabilitation Act because the parties conceded at oral argument that these Acts were not the subject of the appeal. Moreover, the record does not disclose whether the Commonwealth receives federal funding such that it would be subject to the Rehabilitation Act.
 We are similarly unable to address whether Title II of the ADA was a valid exercise of Congress' S 5 power. Lavia's complaint does not specify under which Title his claim is being brought, nor does the District Court's opinion reveal whether its decision applied to Title II in addition to Title I. Additionally, there is an underlying dispute among the circuits as to whether a public employee is even entitled to sue under both Title I and Title II. Cf. Zimmerman v. Oregon Dep't of Justice, 170 F.3d 1169 (9th Cir. 1999) (holding that Title II does not apply to employment claims) with Bledsoe v. Palm Beach County Soil & Water Conservation Dist., 133 F.3d 816 (11th Cir.) cert. denied , 525 U.S. 826 (1998) (holding that employment claim may be brought under Title II). In light of the parties' failure to focus their arguments on Title II, the concessions made at oral argument, and particularly because we cannot be certain as to whether Lavia even brought suit under Title II in the first place, we decline to address or decide here any issue with respect to Title II of the ADA.
 
 
 [3]
 That directive states:
 [e]xternal enforcement may occur and complaints regarding violations of disability-related laws may be filed with and processed through federal agencies such as the EEOC or the United States Department of Justice or state entities such as the Pennsylvania Human Relations Commission in accordance with applicable federal or state acts or regulations.
 Commonwealth of Pennsylvania, Governor's Office, Management Directive 205.25 Amended, (reproduced in Appendix for Appellee) (emphasis added).
 
 
 [4]
 Indeed, courts that have considered whether a state may be sued in federal court under the ADA agree that the ADA satisfies this first prong of the Seminole Tribe test. See, e.g., Stevens v. Illinois Dep't of Transportation, 210 F.3d 732 (7th Cir. 2000); Erickson v. Board of Governors of State Colleges and Univ. for Northeastern Ill. Univ., 207 F.3d 945 (7th Cir. 2000); Garrett v. University of Alabama, 193 F.3d 1214 (11th Cir. 1999) cert. granted in part, Univ. of Ala. at Birmingham Bd. of Trustees v. Garrett, 120 S. Ct. 1609 (2000); Alsbrook v. City of Maumelle, 184 F.3d 999 (8th Cir. 1999) cert. dismissed 120 S. Ct. 1265 (2000); Martin v. Kansas, 190 F.3d 1120 (10th Cir. 1999); Muller v. Costello, 187 F.3d 298 (2nd Cir. 1999); Cooley v. Mississippi Dep't of Transp., 96 F. Supp. 2d 565 (S.D. Miss. 2000); Davis v. Utah State Tax Comm'n, 96 F. Supp. 2d 1271 (D. Utah 2000).
 
 
 [5]
 42 U.S.C. S 12101(b) sets forth Congress' purpose as follows:
 It is the purpose of this chapter --
 (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;
 (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;
 (3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and
 (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.
 
 
 [6]
 42 U.S.C. S 12101(a) lists Congress' findings:
 Congress finds that--
 (1) some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;
 (2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
 (3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;
 (4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;
 (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;
 (6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;
 (7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society;
 (8) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and
 (9) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.
 
 
 [7]
 These factors include, but are not limited to, reference to the nature and cost of accommodation, the overall financial condition of the employer, the effect and impact of such an expense on the resources of the employer, the number of persons employed, and the type of work performed by the employer. See 42 U.S.C. S 12111(10)(B).
 
 
 [8]
 This burden-shifting applies to claims of disparate treatment, and not to claims for failure to reasonably accommodate. See Stevens v. Illinois Dep't of Transp., 210 F.3d 732, 738 (7th Cir. 2000) (citing Pond v. Michelin N. Am. Inc., 183 F.3d 592, 597 n.5 (7th Cir. 1999)).
 
 
 [9]
 Although Cleburne addressed the mentally disabled, there is no reason to believe that a different standard should or would apply to the physically disabled.
 
 
 [10]
 In light of Cleburne, we give little weight to Congress' finding in 42 U.S.C. S 12101(a)(7) that the disabled are a "discrete and insular minority" -- a finding that might lead some to infer erroneously that a heightened standard of scrutiny may be appropriate.
 
 
 [11]
 By contrast, earlier Supreme Court decisions with respect to the Voting Rights Act, for example, have been upheld. See e.g. South Carolina v. Katzenbach, 383 U.S. 301 (1966) (upholding ban on literacy tests for voters, even though they were not, on their face, unconstitutional); Katzenbach v. Morgan, 384 U.S. 641 (1966) (upholding ban on literacy tests); Oregon v. Mitchell, 400 U.S. 112 (1970) (upholding five-year ban on literacy and other similar voting requirements). The historical context of voting legislation, however, reveals that state and local governments were engaged in widespread discrimination against minorities and immigrants, using literacy tests to further their unconstitutional discrimination. Further, prior less drastic legislation aimed at curbing this unconstitutional discrimination had been unsuccessful. See City of Boerne, 521 U.S. at 525-26. As such, the voting legislation was a congruent and proportionate response to the unconstitutional harm sought to be corrected, and did not serve to make substantive changes to the governing law.
 
 
 [12]
 The Court noted that "Congress made no such findings with respect to the States. Although we [the Supreme Court] also have doubts whether the findings Congress did make with respect to the private sector could be extrapolated to support a finding of unconstitutional age discrimination in the public sector, it is sufficient for these cases to note that Congress failed to identify a widespread pattern of age discrimination by the States." Id at 649.
 
 
 [13]
 See, e.g, Amos v. Maryland Dep't of Pub. Safety & Correctional Servs., 178 F.3d 212 (4th Cir. 1999); Martin v. Kansas , 190 F.3d 1120 (10th Cir. 1999); Kimel v. Florida Bd. of Regents, 139 F.3d 1426 (11th Cir. 1998), aff'd, 120 S. Ct. 631 (2000); Coolbaugh v. Louisiana, 136 F.3d 430, 437 (5th Cir. 1998); Clark v. California , 123 F.3d 1267 (9th Cir. 1997); Crawford v. Indiana Dep't of Corrections , 115 F.3d 481 (7th Cir. 1997); Muller v. Costello, 187 F.3d 298 (2d Cir. 1999); Alsbrook v. City of Maumelle, 184 F.3d 999 (8th Cir. 1999)(en banc) (Title II); De Bose v. Nebraska, 186 F.3d 1087 (8th Cir. 1999), republished at 207 F.3d 1020 (8th Cir. 1999), petition for cert filed 68 U.S.L.W. 3391 (U.S. Dec. 1, 1999) (No. 99-946) (extending Alsbrook to Title I without further explanation or analysis).
 
 
 [14]
 The Second Circuit pointed, for example, to the fact that the ADA required only "reasonable accommodation" where such accommodation would not impose an "undue hardship on the operation of the business" of the employer. See Muller, 187 F.3d at 308-09 (citing 42 U.S.C. S 12112(b)(5)(A) and (B)).
 
 
 [15]
 Only the Eighth Circuit determined after City of Boerne but before Kimel that S 5 does not supply the necessary legislative power to abrogate the States' Eleventh Amendment immunity under either Titles I or II of the ADA. See Alsbrook v. Maumelle, 184 F.3d 999 (8th Cir. 1999) (en banc); De Bose v. Nebraska, 186 F.3d 1087 (8th Cir. 1999) republished at 207 F.3d 1020 (8th Cir. 1999), (extending Alsbrook without further analysis or explanation) petition for cert filed 68 U.S.L.W. 3391 (U.S. Dec. 1, 1999) (No. 99-946)
 
 
 [16]
 In Erickson v. Board of Governors, 207 F.3d 945, 948 (7th Cir. 2000), Judge Easterbrook wrote: "Believing that the Supreme Court would tackle the issue [enforcement of the Fourteenth Amendment through the ADA] before July [2000], the [S]econd [C]ircuit declined to reconsider Muller in light of Kimel."
 
 
 [17]
 Notably, neither Lavia nor the Commonwealth cited or discussed the Erickson opinion -- even though it had been filed prior to the date the parties submitted their supplemental briefs to this Court.
 The Seventh Circuit has since reaffirmed this holding twice, based on the reasoning presented in both Erickson and Stevens. See Stanley v. Litscher, No. 99-3764, 213 F.3d 340(7th Cir. May 16, 2000) (Title II of ADA); Walker v. Snyder Jr., No. 38-3308, 213 F.3d 344 (7th Cir. May 16, 2000) (Title II of ADA).
 The Southern District of Mississippi has also held, following Erickson, that Congress did not validly abrogate the States' Eleventh Amendment immunity under Title I of the ADA. See Cooley v. Mississippi Dep't of Transportation, 96 F. Supp. 2d 565 (S.D. Miss. 2000).
 
 
 [18]
 See Ala. Code S 21-7-8; Alaska Stat. S 18.80.220; Ariz. Rev. Stat. S 41-1463; Ark. Code Ann. S 11-13-110; Cal. Gov't Code S 12940; Colo. Rev. Stat. S 24-34-402; Conn. Gen. Stat. S 46a-60; Del. Code Ann. tit. 19, S 724; Fla. Stat. ch. 760.10; Ga. Code Ann. S 34-6A-4; Haw. Rev. Stat. S 378-2; Idaho Code S 67-5909; 775 Ill. Comp. Stat. 5/1-102; Ind. Code S 22-9-1-2; Iowa Code S 216.6; Kan. Stat. Ann. 44-1001; Ky. Rev. Stat. Ann. S 207.150; La. Rev. Stat. Ann. S 23:323; Me. Rev. Stat. Ann. tit. 5, S 4572; Md. Ann. Code art. 49B, S 16; Mass. Gen. Laws ch. 93, S 103; Mich. Comp. Laws S 7.1202; Minn. Stat. S 363.03; Miss. Code Ann. S 43- 6-15; Mo. Rev. Stat. S 213.055; Mont. Code Ann. S 49-4-101; Neb. Rev. Stat. S 48-1104; Nev. Rev. Stat. S 613.310; N.H. Rev. Stat. Ann. S 354-A:7; N.J. Stat. Ann. S 10:5-4.1; N.M. Stat. Ann. S 28-7-2; N.Y. Exec. Law S 296; N.C. Gen. Stat. S 168A-5; N.D. Cent. Code S 14-02.4- 03; Ohio Rev. Code S 4112.02; Okla. Stat. Ann. tit. 25, S 1302; Or. Rev. Stat. S 659.436; 43 Pa. Cons. Stat. S 955; R.I. Gen. Laws S ; S.C. Code Ann. S 1-13-80; S.D. Codified Laws S 20-13- 10 Link ; Tenn. Code Ann. S 8-50-103; Tex. Lab. Code S 21.128; Utah Code Ann. S 34A-5-106; Vt. Stat. Ann. tit. 3, S 95; Va. Code Ann. S 1.5- 41; Wash. Rev. Code S 49.60.180; W. Va. Code S 5-11-9; Wis. Stat. S 11.31; Wyo. Stat. Ann. S 27-9-105.
 
 
 [19]
 See, e.g., Ala. Code S 21-7-8; Alaska Stat. S 39.25.150; Ariz. Rev. Stat. S 41-783; Ark. Code Ann. S 20-14-301; Colo. Rev. Stat. S 24-34- 801; Conn. Gen. Stat. S 46a-70; Fla. Stat. ch. 413-08; Ga. Code Ann. S 30-1-2; Haw. Rev. Stat. S 347- 20; Idaho Code S 56-707; 775 Ill. Comp. Stat. 30/5; Ind. Code S 16-32- 3-5; Iowa Code S 19B.2; Kan. Stat. Ann. 39- 1005; Me. Rev. Stat. Ann. tit. 17, S 1316; Md. Ann. Code art. 30, S 33; Minn. Stat. S 256C.01; Miss. Code Ann. S 43-6-15; Mo. Rev. Stat. S 209.180; Mont. Code Ann. S 49-4- 202; Neb. Rev. Stat. S 20-131; Nev. Rev. Stat. S 284.012; N.H. Rev. Stat. Ann. S 167-C:5; N.J. Stat. Ann. S 11A:7-3; N.M. Stat. Ann. S 28-7-7; N.C. Gen. Stat. S 128-15.3; N.D. Cent. Code S 25-13-05; Okla. Stat. Ann. tit. 74, S 840-2.9; R.I. Gen. Laws S 28-5.1-4; S.C. Code Ann. S 43-33-60; Tenn. Code Ann. S 71-4-202; Tex. Hum. Res. Code S 91.017; Utah Code Ann. S 26-30-3; Vt. Stat. Ann. tit. 21, S 309a; Va. Code Ann. S 51.5-41; Wash. Rev. Code S 70.84.080; Wis. Stat. S 230.01.
 
 
 [20]
 Lavia references, for example, the lack of necessary state and local emergency 911 numbers for the hearing and speech impaired; the ADA's impact on interstate travel; the lack of TDD phones in the Vermont police; and the insufficient number of lift-equipped buses in Vermont. See Appellee's Supplemental Brief at 7 et seq.
 
 
 [21]
 This dissent is also cited in Davis v. Utah State Tax Commission, 96 F. Supp. 2d 1271 (D. Utah 2000) which similarly held that the States were not entitled to Eleventh Amendment immunity with respect to suits brought under Title I of the ADA.
 
 
 [22]
 Because the parties have not clarified whether Lavia's suit is also brought under Title II of the ADA (concerning public accommodation) we do not remand for further proceedings under Title II. However, because we are remanding to the District Court for consideration of the Rehabilitation Act claim, which the District Court determined should proceed and which we have been unable to address here, see supra note 2, if the District Court, in its discretion, determines that a Title II claim has been adequately pleaded and presented by Lavia, the District Court may address that claim on remand as well.